KATE MAHONEY *vs.* ETTA A. DORE.

Suffolk. January 13, 1892. — February 24, 1892.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Personal Injuries — Master and Servant — Negligence — Due Care — Assumption of Risk.*

In an action for personal injuries occasioned to the plaintiff, while in the defendant's employ as a domestic servant, by falling on a flight of stairs leading from the kitchen of the defendant's boarding-house out of doors to the back yard, it appeared in evidence that the stairs, which consisted of twelve or thirteen steps, were covered and enclosed except on the side towards the yard, and there was a skylight over a portion of them in which two or three panes of glass had for a long time been broken, so that rain, snow, and sleet came through and fell upon the stairs below; that at the time of the accident the weather was cold, and it was snowing, and the stairs were slippery from snow and ice upon them; that the plaintiff had occasion to use the stairs frequently in the performance of her duties; that the defendant employed a man, a part of whose duties it was to take care of the stairs; that the accident occurred in the evening, after it was dark, and the stairs were not lighted; that the plaintiff had been over the stairs once before during that evening, and knew that they were slippery; and that when she fell she had hold of the railing and was trying to go safely. *Held,* that the questions whether the defendant was negligent in allowing the stairs to become slippery, whether the plaintiff was in the exercise of due care, and whether the plaintiff assumed the risk of the injury which she received, were properly submitted to the jury.

TORT, for personal injuries occasioned to the plaintiff, while in the defendant's employ, by falling on a flight of stairs leading from the kitchen into the back yard of a boarding-house in Boston, kept by the defendant. Trial in the Superior Court, before *Bond,* J., who allowed a bill of exceptions, in substance as follows.

The plaintiff entered the defendant's employ on June 6, 1889, as a domestic servant, and worked continuously until March 2, 1890, when she received the injuries complained of. The flight of stairs upon which the plaintiff fell consisted of twelve or thirteen steps, and led directly from the defendant's kitchen out of doors into the back yard of the house; the back yard was partly covered by the second floor of the house, extending over it for a space of about fifteen feet square at the foot of the stairs. The stairs were covered and enclosed except on the side towards the yard, and had a skylight over the portion including the fourth, fifth, and sixth steps from the top. Two or three panes of glass had been broken out of the skylight a long time before the plaintiff entered the defendant's employ, and the skylight remained in the same broken condition until March 2, 1890, which was Sunday. When it stormed, rain, snow, and sleet came through the broken glass, and fell upon the stairs below. On the day before the accident a light rain and snow fell, there being one half-inch of snow the next morning; and from half-past one in the afternoon of March 2 until nearly midnight it snowed and the wind blew hard, there being eight to ten inches of snow on the morning after the accident.

The plaintiff, when injured, was on her way, about eight o'clock in the evening, to the toilet-room and to the laundry in the lower story in the performance of her duties. There were two ways of reaching the laundry and lower toilet-room, one by the stairs upon which the plaintiff fell, and the other by stairs inside the house, by passing from the kitchen through the hall, office, and the fireman's room to the laundry, and thence to the toilet-room. The stairway upon which the plaintiff fell was the direct way to the laundry, and was generally used by the help.

The plaintiff testified as follows: " On March 2, 1890, I was going down stairs at a quarter of eight o'clock, and the snow and ice were on the stairs, and I tried to save myself the best way I could on it, for I knew snow and ice both were there. There was no light there at all; it was dark as night. There wasn't any light since I was there. Sometimes I took a match down stairs, but this night I could n't take it because it was so windy and snowy. I got down about four or five steps when I fell, as far as I can judge. There was a skylight just over the stairs.

There were three panes of glass broken in it. The steps and stairs were all wet, and snowy and icy. I was going down to the toilet-room, which led out of the laundry in the basement. We had to go down there, because we were n't allowed to go to any other. The nearest light was a little ways away from the kitchen door, on the right hand side of the door in the kitchen. There was but one light, which was quite a ways from the door; it did not give any light to the stairs. There was not any light at the foot of the stairs. There was not any lamp in the kitchen to take to go down these stairs. I did n't hurry at all. I was trying to go down the best way I could. The snow and the ice being on the stairs caused me to fall. When I fell I had my hand on the banister holding on it, and I was thrown with my face and hands down on the pavement in the yard. My hand was torn from the rail. My feet slipped in the snow and ice on the stairs. I guess I fell about seven or eight steps. Perhaps I went three or four steps down before I slipped and fell. Whenever it rained or snowed it was always wet and slushy. When I went there three panes of glass were broken, one out of the middle and two sides of the skylight; and it was in the same condition the last time I saw it, which was when I fell. The snow and the rain that I saw on the stairs came from the skylight. I often saw snow come down on to those stairs through where the glass was broken. Those stairs were attended to once a week by James, the fireman. There was nothing done to these steps at this time by the fireman or anybody else. It was snowing very bad on Sunday, March 2. It was snowing at two o'clock, and I don't know whether it was snowing before that; but it was snowing very bad when I went to the hospital at eight o'clock at night. Ten months I was employed there, in this same part of the house. I was very familiar with those stairs which led down into the back yard. Sometimes I would go down five or six times a day. There had been no change in the construction of the stairs up to the time I fell; they were just the same as they were when I first went there. I saw snow fall on those steps that day. I saw the defendant go up and down those stairs, Saturday, March 1, 1890, when it was storming, and saw her pick up her clothes to keep them out of the wet and dirt. I was n't down many times, — a couple of times

that afternoon. I went down twice into the laundry that even-ing after dark. I went down about four or five steps, then I turned back again. I went down the first time about ten min-utes, it was no more than five minutes, I guess, before I fell. About half-past seven or twenty-five minutes of eight I went down five or six steps. I came back for my dish-towels, to wash them down where we had a board in the laundry. The second time I went down I went to take my dish-towels down, and that was the time I fell. I had passed over this place where the snow and ice was. I passed over it, turned and went back' over it again. I noticed the snow and ice when I first went down, and the second time I went down I tried to save myself as good as I could. I put my hand on the banisters, and tried to crawl down in the dark; my feet were taken from me."

Lizzie Dyer, a cook in the defendant's employ, testified as follows: " The defendant gave orders in the kitchen, when the plaintiff was present, for us to use only the lower toilet-room. The skylight was broken two or three months before the plain-tiff came to work. When it rained or snowed the stairs were all wet. The fireman used to wash them Saturdays, and when it would be stormy he would not wash them, because it was no use. I always saw him doing it on Saturday; but he did n't do it this Saturday, because it was too stormy. He said he was n't going to scrape the stairs or clean them, because it was no use on account of its being so stormy. All I saw him do was the stairs. I never saw him clean any snow off the stairs. I had to go down these stairs and use them commonly. There was no light on the stairway. The gas stood right over in the corner of the kitchen, and of course it did n't show any light on the stairs. The defendant went up and down those stairs Saturday afternoon, and she picked up her clothes so as not to wet them."

The defendant testified as follows: " James Degan, the fire-man, was employed to keep two fires in the boilers; he was employed to build the fires, to take care of the court and the stairs, freeze the ice-cream, chop the ice for the different meals, and to carry down the swill-tubs. I mean the stairs going from the kitchen down toward the laundry. There were seven gas-burners in the kitchen, at the head of the stairs, at the time of the accident, one of which was lighted. The skylight was perfectly flat."

It was in evidence that cakes of ice were taken up these stairs by the iceman on Saturday afternoon preceding the accident.

It was in evidence that, at eight o'clock in the evening of Sunday, March 2, 1890, in Boston, the thermometer was twenty degrees above zero.

Upon the foregoing facts, which were undisputed, the defendant requested the judge to rule as follows: "1. There was no legal obligation of the defendant to the plaintiff either to repair the skylight or to keep the stairs free from rain, snow, or ice, and the plaintiff cannot recover if injured by reason of rain, snow, or ice which came through the broken skylight and fell on to the stairs. 2. Upon the undisputed facts in the case, the plaintiff was not in the exercise of due care, and cannot recover. 3. Upon the undisputed facts in the case, the plaintiff was injured by the negligence of a fellow servant employed by the defendant, and whose duty it was to clear the ice and snow from the stairs upon which the plaintiff fell, and she cannot recover. 4. If the skylight was broken when the plaintiff began her employment, and continued in the same condition to the time of her injury, she cannot recover on account of snow, rain, or ice coming through or forming on the stairs where she claims to have fallen." The judge declined so to rule.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*C. F. Kittredge*, for the defendant.

*B. C. Moulton*, for the plaintiff.

KNOWLTON, J. The plaintiff fell and was hurt on a flight of stairs, consisting of twelve or thirteen steps leading from the kitchen of the defendant's boarding-house out of doors to the back yard. The stairway was covered and enclosed except on the side towards the yard, and there was a skylight over a portion of it, in which two or three panes of glass had for a long time been broken, so that rain, snow, and sleet came through and fell upon the stairs below. The evidence tended to show that at the time of the accident the weather was cold, and it was snowing, and that the stairs were slippery from snow and ice upon them. The plaintiff had occasion to use these stairs frequently as a servant of the defendant, and it was the duty of the defendant to keep them safe, so far as the exercise of reasonable care and

diligence on her part would accomplish that result. It was a duty of which she could not relieve herself by delegating it to another. If she could properly intrust a part of the work to a mere servant, she, or somebody representing her for whose conduct she would be responsible, must exercise reasonable care and supervision to see that the desired result was attained. In view of the fact that the glass over the stairs had been broken out for a long time, exposing the stairs to an accumulation of snow and ice, we are of opinion that it was a question for the jury whether she was negligent in allowing the stairs to become slippery, and that it cannot be said, as matter of law, that she is relieved from liability even if it was the duty of her servant, the engineer, to clean the stairs, and if his negligence contributed to the plaintiff's injury. *Moynihan* v. *Hills Co.* 146 Mass. 586.

There was evidence for the jury on the question whether the plaintiff was in the exercise of due care in trying to go down the stairs. She had occasion to go there, and although it was dark and she knew there was snow and ice on the steps, it was the way provided for her use, she was very familiar with it, she had hold of the rail and was trying to go safely, and it does not appear that she knew the stairs were so slippery that it would be careless to try to pass over them. The fact that she knew there was some danger in trying to go over them does not show, as matter of law, that she was negligent. This part of the case was rightly submitted to the jury. *Mahoney* v. *Metropolitan Railroad,* 104 Mass. 73. *Looney* v. *McLean,* 129 Mass. 33. *Watkins* v. *Goodall,* 138 Mass. 533. *Fitzgerald* v. *Connecticut River Paper Co., ante,* 155.

It is contended that the defendant is not liable because the plaintiff assumed the risk of injury, and that the doctrine *Volenti non fit injuria* applies. See *Myers* v. *Hudson Iron Co.* 150 Mass. 125; *Mellor* v. *Merchants' Manuf. Co.* 150 Mass. 362; *Lothrop* v. *Fitchburg Railroad,* 150 Mass. 423; *Boyle* v. *New York & New England Railroad,* 151 Mass. 102. The cases in which this doctrine can be applied by the court, in ordering a verdict for the defendant on the undisputed facts, are usually those in which the plaintiff's assumption of the risk grows out of the contract implied in undertaking service in a dangerous business. Except in regard to the danger of injuries from the negligence

of fellow servants in certain cases, under the St. of 1887, c. 270, and possibly some other dangers under the same statute, a servant impliedly agrees to assume the obvious risks of the business in which he engages, and his implied agreement, except as it may be affected by that statute, which we are not now considering, includes not only the risks which are ordinarily incident to that kind of business, but also those which grow out of the peculiar way in which his employer is conducting it, so far as that way and those risks are obvious when he makes his contract. If he agrees to work in a business which he knows is carried on with machinery much more dangerous than that commonly used in that kind of business, he assumes the obvious risks incident to the use of that machinery. By making a contract to serve for pay where such dangers surround him, he exposes himself to the danger voluntarily.

But in a much larger class of cases it is a question of fact, when one has been injured by reason of an exposure which he knew involved some risk, whether he voluntarily took the risk of the injury which he received. The question divides itself into two parts: first, whether he understood and appreciated the risk, which is sometimes a question of law and sometimes a question of fact; secondly, if he appreciated it, whether he assumed it voluntarily, or acted under such an exigency, or such an urgent call of duty, or such constraint of any kind, as in reference to the danger deprives his act of its voluntary character. He may reluctantly, so far as the danger is concerned, and under extraneous pressure which amounts almost to compulsion, expose himself to a danger which originates in another's fault, and under such circumstances it cannot be said that he assumes the risk voluntarily.

In a very recent case in England, (*Smith* v. *Baker*, [1891] A. C. 325,) it has been decided by the House of Lords that a servant who continues to work where he is exposed to a danger which he understands and appreciates, and which results from his employer's negligence, and which he did not assume by his implied contract when he entered the service, does not, as matter of law, voluntarily assume it by merely remaining in a place which is rendered unsafe by his master's fault. We are not aware of any adjudications in this Commonwealth which are necessarily

inconsistent with this just and reasonable doctrine, although different opinions have been expressed on this point by eminent judges both here and in England. Most of the cases in this State which relate to a servant's assumption of a risk refer to risks assumed on entering the service. *Leary* v. *Boston & Albany Railroad*, 139 Mass. 580. See *Scanlon* v. *Boston & Albany Railroad*, 147 Mass. 484; *Fitzgerald* v. *Connecticut River Paper Co.*, *ante*, 155, and cases there cited. The tendency of recent decisions is to hold that, in regard to dangers growing out of the master's negligence, which are not covered by the implied contract between the master and servant when the service was undertaken, it is a question of fact whether a servant who works on appreciating the risk assumes it voluntarily, or endures it because he feels constrained to. *Fitzgerald* v. *Connecticut River Paper Co.*, *ubi supra.*

In the present case no such danger as that which caused the plaintiff's injury was obvious when she entered the defendant's service, and she cannot be held to have impliedly contracted in reference to it, or to have then assumed it. In reference to the effect of what occurred afterwards, we are of opinion that it was a question of fact whether, when she started down the stairs, she understood and appreciated the danger of going, and, if she understood it, whether she assumed it voluntarily, or because she felt obliged to continue in the service and make the best of the situation in which she found herself.

Of course, if she had not exercised such care as ordinary persons are accustomed to exercise under like circumstances, she could not recover, even if she did not assume the risk voluntarily. We are of opinion that on all the questions at issue the case was rightly submitted to the jury.

*Exceptions overruled.*