WILLIAM A. REID

*vs.*

EASTERN STEAMSHIP COMPANY.

Cumberland.    Opinion May 18, 1914.

*Appliances.    Assumption of Risk.    Contributory Negligence.    Damages.*
*Defective Machinery.    Exceptions.    Fireman.    Negligence.*

An action to recover damages for personal injuries alleged to have been sustained
by plaintiff while in the employ of the defendant as fireman on its steamer
"Ransom B. Fuller" by reason of large quantities of sea-water coming into the
fire-room through the ash ejector pipe and hopper, alleged to have been defec-
tive and out of repair.

*Held:*

1.   It is not established to a reasonable certainty that the jury erred in
their conclusion that the ash ejector was defective and out of repair in conse-
quence of which an unreasonable and dangerous quantity of sea-water came
into the fire-room making it an unsafe place for the plaintiff to work in.

2.   The evidence shows clearly that in rough seas large quantities of sea-water
would come into the fire-room, through the ash ejector pipe, unless the cover of
the hopper in the fire-room, with which the pipe was connected, was securely
fastened down, and the officers of the ship, who had supervision of the fire-room,
knew the defective condition of the hopper and that the holding-down bolts
of its cover had long before rusted away and had not been renewed.

3.   There is no evidence that the plaintiff is chargeable with any act of omission
or commission that contributed to his alleged injuries, other than remaining
in the fire-room and performing his work as a fireman during his watch under the
conditions existing there.

4.   But the fact that he so remained in the fire-room does not necessarily, as a
matter of law, preclude him from recovering, under the doctrine of the assump-
tion of the risk.

5.   The doctrine of the assumption of the risk involves two fundamental ques-
tions; first, whether the employee understood and appreciated the risk, and
second, if he understood and appreciated the risk, whether he assumed it
voluntarily.

6.   In the case at bar, both of those questions were submitted to the jury, with
full and appropriate instructions, and they were proper questions for the jury.

7.  Where a servant has been subjected to a risk and danger, owing to a breach of duty on the part of his employer, the mere fact that he continues his work, even though he knows the risk and does not remonstrate, does not necessarily, as a matter of law, preclude him from recovering in respect to that breach of duty of his employer, under the doctrine of the assumption of the risk.

8.  Though it appears that the servant was injured by remaining at his post and working on after knowing of a risk arising from his employer's fault, still courts of justice should not turn him away unheard and with an arbitrary pronouncement that he must be held to have voluntarily assumed the risk of being so injured, whatever his explanations might be.

9.  In framing a hypothetical question, the practice is for the question to contain the assumption of the existence of such facts and conditions as the jury may be authorized to find upon the evidence as it then is, or as there may be good reason to suppose it may thereafter appear to be.

On motion and exceptions by the defendant. Motion and exceptions overruled.

This is an action on the case by the plaintiff to recover of the defendant damages for personal injuries which the plaintiff claims he sustained on the 28th day of July, 1911, while in the employ of the defendant in the capacity of fireman on its steamer, "Ransom B. Fuller," by being exposed to sea-water while working in the fire-room, which came into the fire-room through the defective pipe and hopper. The defendant pleaded the general issue. The jury rendered a verdict for the plaintiff of five thousand and five hundred dollars. The defendant had various exceptions, which are specially considered in the opinion, and filed a general motion for a new trial.

The case is stated in the opinion.

*William Lyons, and Benjamin Thompson,* for plaintiff.

*William H. Gulliver, and Gerry L. Brooks,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, HALEY, PHILBROOK, JJ.

KING, J.    This is an action to recover damages for injuries alleged to have been sustained by the plaintiff on the night of July 28, 1911, while in the defendant's employ as a fireman on its Steamer "Ransom B. Fuller" then on her regular trip from Portland, Maine, to Boston. A verdict of $5500 was returned for the plaintiff, and the case is before this court on the defendant's motion for a new trial and on exceptions.

THE MOTION. Preliminary to a statement of the specific questions raised by the motion it will be advantageous to point out briefly certain facts which are practically undisputed.

The "Ransom B. Fuller" is a side-wheel passenger and freight steamer of the burden of 2329 gross tons. She is equipped with two boilers, located in the fire-room in the lower hold near the keelson, under each of which are two furnaces with the doors opening toward the after part of the ship. The fire-room proper, or floor space in front of the furnaces where the firemen work, is about 26 feet in length athwart the ship and 12 feet and 10 inches wide from the line of the furnaces back to a steel partition. The floor of the fire-room is constructed of large squares of iron, and it is 8 or 10 feet below the water line of the ship. On both the port and starboard sides of the fire-room are coal bunkers. The main engine-room is on the deck above. Two firemen are in each watch of 4 hours duration, except the dog watch, and each has charge of one of the boilers and the two furnaces under it, and when the ship is underway it is the duty of the fireman to so tend his fires that the required pressure of steam will be kept up. The ashes drop through the furnace grates into large ash pans and these are drawn out onto the fire-room floor by the ash man who throws the ashes back against the steel partition from where they are thrown overboard by the use of an ash ejector, so called. This appliance consists of a cast iron hopper or receptacle about 18 inches square at the top, tapering down to about 12 inches square at the bottom, and being about 18 inches deep, from the bottom of which an 8 inch iron pipe extends across and out through the port side of the ship just under the guard and a little forward of the paddle wheel. The top of the hopper is about 3 feet above the fire-room floor and about 6½ feet below the outboard end of the 8 inch pipe. When ashes are to be ejected they are shoveled into the hopper and from there they are carried outboard through the cast iron pipe by a powerful stream of water forced into the pipe by the pumps. A cast iron cover forms the top of the hopper, being hinged thereto on one side. The cover was designed and constructed to be held down when necessary by means of swinging bolts, called "holding-down bolts," attached to the hopper on three sides and so arranged that they could be swung into "ears" or "slots" on the cover and screwed down making a tight joint between the cover and the hopper thereby preventing sea-water coming into the fire-room through the hopper

when heavy seas submerged the outer end of the 8 inch ejector pipe. It was conceded that the holding-down bolts were not in usable condition on the night in question; in fact they had completely rusted away some years before and had not been renewed, a condition of which the defendant had knowledge through its officers.   The plaintiff shipped on the steamer in April, 1911, as a fireman and continued in that capacity until a few days after the night of his alleged injuries. The regular sailing time of the Fuller from Portland was at 7 o'clock in the evening.   On the night in question, owing to a heavy easterly sea, she did not sail until 10-36 P. M., and in about half an hour thereafter she was outside of Portland Harbor.   The plaintiff's watch began at 12 o'clock midnight at which time he and another fireman went down into the fire-room and relieved the two firemen who had been on the previous watch.   The steamer was then out on the high seas and was rolling so badly that each time she rolled the outboard end of the 8 inch ejector pipe was submerged whereby large quantities of sea-water came through the pipe and hopper into the fire-room, and at that time there was water in the fire-room that covered the floor to a depth on a level, as estimated by different witnesses, of from 2 or 3 to 6 or 8 inches which washed back and forth in considerable waves.   The temperature of the room was from 115 to 140 degrees, and the plaintiff remained there tending his furnaces throughout his watch of four hours, during which time sea-water continued to come in through the ash ejector as the ship rolled, and the conditions remained, as he claimed, substantially the same.

The plaintiff alleged, and introduced evidence tending to show, that in consequence of his standing and working during his watch of four hours in that sea-water with the rest of his body subjected to the high temperature of the room he became sick and much disordered and contracted acute Nephritis or Bright's Disease and other ailments from which he has ever since suffered and still suffers with little or no prospect of recovery.

The questions involved in the issue, whether the defendant is liable to the plaintiff for his alleged injuries, may be thus briefly stated:   (1)   Was the ash ejector at the time of the plaintiff's alleged injuries defective and out of repair on account of which an unnecessary and dangerous quantity of sea-water came into the fire-room?   (2)   Was the defendant negligent in permitting the ash ejector to be thus defective and out of repair?   (3)   Did the plaintiff

sustain personal injuries resulting in his damage in consequence of the sea-water that was in the fire-room during his watch? (4) Was there any negligence on the part of the plaintiff that contributed to his injuries; or did he, by going into the fire-room and working there during his watch under the existing circumstances, assume the risk of the injuries that resulted to him in consequence of the sea-water?

All these questions were properly submitted to the jury and they decided them in the plaintiff's favor. Is their decision manifestly wrong? In other words, is it so unmistakably contrary to the plain import of the evidence that it should be held clearly erroneous? That is the precise question presented by the motion. The record is voluminous, consisting of about 800 printed pages. We have examined it in detail and with painstaking care, and we are not persuaded from a consideration of all the evidence in the case that the jury obviously erred in their decision as to the defendant's liability.

It would be practically impossible within the reasonable limits of an opinion to make a detailed analysis or extended summary of the evidence introduced in the case, and we shall here make only a brief general reference to some of the proof adduced in support of the issues involved.

1. It was not contended that there was any shuttle valve or other devise by which the outside end of the 8 inch ejector pipe could be closed, or any valve in the pipe to prevent sea-water from flowing through it into the hopper, but the defendant claimed that the ejector was not in fact defective and out of repair, although there were no holding-down bolts, because a "prop," one end of which could be placed up against a beam in the deck above and the other end upon the cover, had been used and was a practical appliance to be used for the purpose of holding the cover in place when necessary in rough seas. Much testimony was introduced on the one side and the other as to the use of a "prop" as an appliance for holding down the hopper cover. It was claimed on the part of the plaintiff that a prop could not be kept in place owing to the springing of the ship as she rolled and pitched in heavy seas, and on the other hand the defendant claimed that by properly wedging the prop it would remain in place and was a fit means to keep the cover down. No particular "prop" had been provided for the purpose, but when one was needed the water tender or some one else would procure a piece of plank or joist

and saw it off the right length and use it as such a prop. Mr. Frazier, an expert marine surveyor and engineer, called by the defendant, testified that when the ship rolled to starboard, assuming the ejector pipe to be full of water, there would be an upward pressure of 1300 pounds on the hopper cover. He also testified that the steamer would roll the outer end of the ejector pipe under water three times a minute in the sea as it was described to be at the time in question, and that with the cover of the hopper off 210 gallons of water a minute would come into the fire-room through the hopper.

On the night in question a prop was used to some extent at least in an attempt to hold down the hopper cover, but the testimony was conflicting as to the length of time it was kept in place, and the fact was that notwithstanding its attempted use large quantities of water came in through the hopper.

Eaton, a fireman on the preceding watch, testified that large quantities of water began to come in through the ash ejector in a few minutes after the steamer got outside of Portland Harbor and that the water was 5 or 6 inches on a level over the floor, and as the ship rolled it would rise "nearly to your knees." Mattocks, a fireman called by the defendant, testified that between 12 and 1.30 o'clock of the night in question he observed "a considerable amount of water over that fire-room floor" and that as the steamer rolled "there would probably be a wash going up against the bunkers of may be four or five inches." Eisner, another fireman called by the defendant, testified that the water would attain a height of five or six inches as it run back and forth across the fire-room floor. Cole, called by the defendant, who was on the watch with the plaintiff, testified that water came in through the hopper every time the ship rolled and that it was five inches high as it went across the floor, and "possibly it might have been" higher. White, called by the defendant, testified that when he came on watch at 4 o'clock at the end of the plaintiff's watch, and after the sea had somewhat subsided, he found "an inch or two" of water on the fire-room floor, and that water was still coming in through the hopper.

The plaintiff testified that when he went into the fire-room the water was 6 or 8 inches deep, and that it would wash nearly to his knees as the ship rolled and that that condition continued about the same during his whole watch, except that the sea became somewhat smoother.

In view of all the evidence we think it is not established to a reasonable certainty that the jury erred in their conclusion that the ash ejector, in its then condition, was defective and out of repair, in consequence of which an unreasonable and dangerous quantity of sea-water came into the fire-room making it an unsafe place for the plaintiff to work in.

2. The evidence shows that the officers of the ship, who had supervision of the fire-room and its appliances and whose duty it was to see that it was maintained in a reasonably suitable and safe condition, knew that great quantities of sea-water would come in through the ash ejector in rough seas unless the hopper cover was securely and tightly held down, and that they knew the condition of the hopper at the time in question, and that the holding-down bolts had long before rusted away and had not been renewed, and that no other appliance had been provided, or was used, to fasten the cover down, except the "prop." It follows, therefore, as a necessary conclusion that, if the ash ejector, in its then condition, was defective and out of repair, the defendant was negligent in so maintaining it.

3. There can be no reasonable doubt that the evidence justified the jury in finding that the plaintiff sustained personal injuries resulting in his damage in consequence of the water that was in the fire-room during his watch. The extent of those injuries may be more properly considered under the question raised as to the amount of damages awarded.

4. There is no evidence that the plaintiff is chargeable with any act of commission or omission, that contributed to his alleged injuries, other than remaining in the fire-room and performing his work as fireman during his watch. But the defendant confidently contends that because the plaintiff so remained and worked during his watch under the existing conditions he is precluded from recovering for any injuries resulting to him from those conditions, either on the ground of contributory negligence, or under the doctrine of the assumption of risk.

There is a distinction between contributory negligence and the voluntary assumption of a risk or danger as defenses in negligence cases. The two defenses are logically independent. The former is predicated on the carelessness of the plaintiff in the employment he has undertaken which carelessness contributed to his hurt, while the latter involves the idea that he voluntarily entered upon, or con-

tinued in, the employment knowing and appreciating the risk and danger of being so hurt. The latter defense is often applicable when there is no carelessness at all. In individual instances it sometimes becomes a close question whether the facts relied upon as a bar to recovery tend to establish the one or the other defense. In the case at bar the defendant contends that the fact that the plaintiff continued his work in the fire-room during his watch knowing the conditions there is a bar to his right of recovery for whatever injuries resulted to him on account of those conditions. And it may not be clearly apparent whether that contention is more logically based. on the ground that his act in so continuing to work under the existing conditions was a negligent act that contributed to his injuries, or on the doctrine of the maxim, *Volenti non fit injuria*—the doctrine, that one who knows of a danger from the negligence of another, and understands and appreciates the risk therefrom, and voluntarily exposes himself to it, is precluded from recovering for an injury which results from the exposure. This doctrine is recognized and adopted by our court in many cases. *Buzzell* v. *Laconia Manf'g Co.*, 48 Maine, 113; *Mundle* v. *Manf'g Co.*, 86 Maine, 400, 407; *Conley* v. *Express Co.*, 87 Maine, 352, 356; *Cunningham* v. *Iron Works*, 92 Maine, pp. 511-512; *Dempsey* vs. *Sawyer*, 92 Maine, 295, 298; *Golden* v. *Ellis*, 104 Maine, 177; *Wiley* v. *Batcherlder*, 105 Maine, 536, 539. It seems not to be of essential importance however in this case to determine with certainty to which of the two defenses the defendant's contention logically belongs, since the fundamental propositions necessary to sustain the contention in this case are the same, whether the act relied upon tends to show contributory negligence or an assumption of the risk. We think, however, that the question, whether the plaintiff's act in continuing his work in the fire-room under the existing conditions precludes his right of recovery, is to be determined with reference to the doctrine of the maxim, *Volenti non fit injuria*, the assumption of the risk, rather than that of contributory negligence.

The doctrine of the assumption of the risk involves two fundamental propositions, first, that the employee knew of the risk, and second, that he voluntarily assumed it. On this branch of the law it is well settled, that an employee is presumed to have assumed the ordinary, obvious and apparent risks that are naturally incident to the service for which he has contracted. As to those risks the presumption includes both knowledge and voluntariness. Such pre-

sumption arises out of the contractual relation of the parties. But the employee is not presumed to have known and voluntarily assumed other risks that are attributable to the employer's negligence, which either did not exist at the time of the employment, or of the existence of which he then had no knowledge. Accordingly when the doctrine of assumption of risk is interposed as a bar to recovery for an injury resulting from a risk of the latter class, a question of fact ordinarily is raised whether he took the risk of the injury received. Concerning such a question, Knowlton, J. in *Mahoney* v. *Dore,* 155 Mass., 513, 519, appropriately said: "The question divides itself into two parts; first, whether he understood and appreciated the risk, which is sometimes a question of law and sometimes a question of fact; secondly, if he appreciated it, whether he assumed it voluntarily, or acted under such an exigency, or such an urgent call of duty, or such constraint of any kind, as in reference to the danger deprives his act of its voluntary character. He may reluctantly, so far as the danger is concerned, and under extraneous pressure which amounts almost to compulsion, expose himself to a danger which originates in anothers fault, and under such circumstances it cannot be said that he assumes the risk voluntarily."

It is not enough that the employee knew of the risk; it must also be shown that he knew and appreciated the danger flowing from the risk, or else such danger must have been so obvious that an ordinary prudent person, under the circumstances, would have appreciated it. *Mundle* v. *Manf'g Co.,* 86 Maine, 400, 406; *Frye* v. *Bath Gas and Elec. Co.,* 94 Maine, 17; *Bowen* v. *Mfg. Co.,* 105 Maine, 31; *Colfer* v. *Best,* 110 Maine, 467; *Fitzgerald* v. *Connecticut River Paper Co.,* 155 Mass., 155, 161; *Thomas* v. *Quartermaine,* 18 Q. B. D., 685; *Yarmouth* v. *France,* 19 Q. B. D., 647. See the very recent case of *Gila Valley G. & N. R. Co.* v. *Hall,* decided January 5, 1914, by the United States Supreme Court.

We think the tendency of recent decisions, both American and English, is to hold that it is a question of fact whether an employee who becomes aware of and appreciates a risk of danger which has arisen from his employer's negligence, and which is not covered by implication in his contract of service, and who yet works on, voluntarily assumes that risk or endures it because he feels constrained to under the exigences of his situation. In *Smith* v. *Baker* (House of Lords 1891) A. C., 325, 354, 60 L. J. Q. B. N. S., 683, Lord Watson

said: "Whether the plaintiff appreciated the full extent of the peril to which he was exposed or not, it is certain that he was aware of its existence, and apprehensive of its consequence to himself ; so that the point to be determined practically resolves itself into the question whether he voluntarily undertook the risk. If upon that point, there are considerations pro and contra, requiring to be weighed and balanced, the verdict of the jury cannot be lightly set aside." After commenting on the necessity that it should appear that the workman appreciated or had the means of appreciating the danger, he further says: "But assuming that he did so, I am unable to accede to the suggestion that the mere fact of his continuing at his work, with such knowledge and appreciation, will in every case necessarily imply his acceptance. Whether it will have that effect or not depends, in my opinion, to a considerable extent upon the nature of the risk, and the workman's connection with it, as well as upon other considerations which must vary according to the circumstances of each case." See *Thrussell* v. *Handyside,* 20 Q. B. D., 359; and *Yarmouth* v. *France,* 19 Q. B. D., 647. See also *Fitzgerald* v. *Connecticut River Paper Co.,* supra. And in *Kane* v. *Northern Cent. R. Co.,* 128 U. S., 91, it is said: "But in determining whether an employee has recklessly exposed himself to peril, or failed to exercise the care for his personal safety that might reasonably be expected, regard must always be had to the exigencies of his position, indeed, to all the circumstances of the particular occasion."

In the case at bar, the presiding Justice submitted to the jury, with full and appropriate instructions, the question whether the plaintiff knew the unsafe condition of the fire-room and appreciated, or by the exercise of reasonable care on his part ought to have appreciated, the danger flowing from that unsafe condition; and he also left it to them to decide as a fact whether the plaintiff, if he knew and appreciated the danger, voluntarily assumed it by remaining at his post during his whole watch. We think those were proper issues for the jury. Accordingly the only question which we are called upon to decide on this branch of the case is whether, upon all the evidence, the jury were warranted in finding in the plaintiff's favor upon those issues.

An examination of the evidence clearly shows that prior to the night in question the plaintiff had little or no practical knowledge of the construction and operation of the ash ejector. He had never

before been on a ship equipped with such an appliance, it was no part of his duty to operate this one, and he had not examined it or received any special information respecting it.    It is true that on one previous occasion some sea-water came into the fire-room through this ash ejector while the plaintiff was at work there, but he testified that on that occasion the quantity of water was comparatively small and caused no particular inconvenience.    But he did not then, nor at any time prior to the night in question, know that there was no means by which the outboard end of the ejector pipe could be closed when an emergency required it, or that there were no relief valves in the pipe.    Accordingly it was an authorized conclusion from the evidence that neither at the time of the plaintiff's contract of service, nor at any time thereafter when the ship was in port when and where he might reasonably have refused to continue in the service and have left the ship, did the plaintiff have knowledge in fact or in law of the defective condition of the ash ejector and the risks and dangers incident to his service in consequence of its being maintained in that condition.    Accordingly the question whether the plaintiff knew and appreciated the risk and voluntarily assumed it is to be considered in connection with the fact that the risk came upon him suddenly while he was engaged in his regular service, and was attributable to his employer's negligence.

He did have knowledge of the existing conditions in the fire-room when his watch began; and it is evident that he then apprehended some discomfort to himself on account of that condition, for he remarked, as he testified, to a superior officer, while standing on the deck above looking down into the fire-room and just before going down there, that, "It is pretty tough for a man to go down into that." But whether he appreciated, or should have appreciated, the peril of that condition, the danger flowing therefrom to himself if he remained there at his work during his watch, is a question concerning which intelligent and fair minded men might reasonably doubt, to say the least.    Indeed, it would almost seem to be a necessary conclusion that the plaintiff, being an ordinary workman, was not capable of appreciating that peril, that he did not possess the necessary technical knowledge and information to enable him to understand and appreciate the effect upon his system of working for four hours with his feet and legs in cold sea-water and the rest of his body subjected to a temperature of from 115 to 140 degrees of heat.    At all events, we

think the jury's finding, so far as it necessarily imports that the plaintiff did not know and appreciate the danger to himself from the condition of the fire-room, is not so plainly and manifestly unwarranted as to require the court to set it aside.

But if the plaintiff did know and appreciate the risk and danger to himself from continuing at his work, did he *voluntarily* assume it? The jury decided that he did not. Is that decision justified? We are fully in accord with the idea, suggested above as the tendency of recent decisions, that, where a servant has been subjected to risk owing to a breach of duty on the part of his employer, the mere fact that he continues his work, even though he knows of the risk and does not remonstrate, does not necessarily, as a matter of law, preclude his recovering in respect of the breach of duty, under the doctrine of *Volenti non fit injuria.* Though it appears that the servant was injured by remaining at his post and working on, after knowing and appreciating a risk arising from his employer's fault, still courts of justice should not turn him away unheard, and with an arbitrary pronouncement that he must be held to have voluntarily assumed the risk of being so injured whatever his explanation might be. That doctrine is too rigorous. It works injustice. It makes the servant bear an unfair and unequal burden under the pressure of present economic conditions. In such case we think it becomes a question of fact whether the servant did voluntarily assume the risk, determinable from a careful consideration of the exigences of his situation at the time, and of all the circumstances and conditions under which he acted. The weighing and balancing of such considerations and drawing proper inferences therefrom are matters well within the province of a jury.

It is a matter of common knowledge that the duties of the firemen of a steamer when underway at sea are of great importance. Unless the fires are properly tended and sufficient steam pressure kept up the ship may become unmanageable. The neglect of a fireman to perform his duties when the ship is in dangerous seas might imperil the safety of the ship and all on board. In the case at bar when the time arrived for the plaintiff's watch in the fire-room to begin the steamer was underway on the ocean and there was at least a heavy sea running. He then saw there was sea-water in the fire-room, but nevertheless he went in and remained there keeping his fires up during his watch. He conceived that to be his duty which he could

not shun from fear or apprehension of personal discomfort and injury. The defendant contends, however, that the plaintiff, if he appreciated danger to himself, should have left his fires and reported to his superior officer, who might have put some one in his place, and failing to do that he must be held to have voluntarily assumed whatever risk there was. On the other hand he testified that he understood, from what he had read and heard concerning the rules and regulations enforceable on ships at sea, that he was bound to remain at his post notwithstanding the danger, and that if he refused to do so, under those circumstances, it would make him liable to punishment. His statements now made as to the influences that were then operative upon his mind are, of course, not conclusive on the question of the voluntariness of his conduct, and indeed, they may have little or no weight on that question, still they are to be considered for what they are worth with all the other facts and circumstances tending to disclose whether he acted voluntarily or not. We do not perceive that any different rule of law is applicable when considering the question whether an employee on shipboard who continued at his post after knowing and appreciating a risk which arose from his employer's negligence, was himself negligent in so doing or voluntarily assumed the risk, than when considering the effect of similar conduct of an employee engaged in service on land. In each case the important considerations are the employee's situation at the time, the character of his service, his responsibility for the safety of others, the nature of the risk and his relation to it, and all the circumstances and conditions that might have exerted some pressure upon him preventing a free and voluntary exercise of his choice.

This question whether the plaintiff voluntarily assumed the risk to himself involved in continuing at his post tending his fires, under the existing circumstances, or endured that risk because he was constrained to do so by the exigencies of the situation and his relation to it, was submitted to the jury under appropriate instructions. It was a proper question for them to determine and we think their decision upon it must stand.

5. The evidence reasonably justifies the finding, that the plaintiff, a young married man of 37 years of age, was, prior to the time of the accident, enjoying fairly good health, at least; that immediately after his alleged exposure he became ill and developed acute nephritis or acute inflamation of the kidneys, called Bright's Disease;

that he has been sick ever since and wholly incapacitated to perform any manual labor, and that at the time of the trial, April, 1913, his physical condition was most serious with no prospect of any improvement.

Dr. Barrett was called to see him on Aug. 14, 1911, and attended him constantly till the 14th of September when he was removed to the Marine Hospital in Portland. At his first visit the doctor found him ill with headache, cough and general weakness, "due to what he said was taking cold while a stoker in a steamer." His condition became rapidly worse and on the 22nd of August the doctor diagnosed his case as acute nephritis or inflamation of the kidneys. According to the doctor's testimony the plaintiff was then in a serious condition. He was bloated on "all parts of the body, from the crown of his head to the sole of his feet," to use the doctor's words, and he "considered him in a critical condition" at the time he last saw him before he was removed to the hospital. He testified that the plaintiff's condition at the time of the trial was bad, that he could not perform any manual labor, that his chances of recovery were "very poor," and that he was "more feeble than he was when he first came out of the Marine Hospital" eighteen months before.

Dr. Albert F. Small, connected with the Marine Hospital, testified that the plaintiff was brought to the hospital in an ambulance on September 15, 1911; that he was then in a semi-conscious state and critically ill; that his dropsical condition involved his entire body, and he diagnosed the case as acute nephritis or so called Bright's Disease. The plaintiff remained at the hospital until October 22, 1911. Dr. Small saw him on an average of once a week after that time, and examined him in company with other physicians. It was his expressed opinion that the plaintiff "has failed" since he left the hospital, and that his chances of recovery "are very, very poor."

It would be quite impracticable here to comment in detail upon all the evidence introduced tending to show the character and extent of the plaintiff's sickness and present physical condition, and to establish the plaintiff's contention that they are attributable to his alleged exposure. But after a careful examination and consideration of all the evidence, including all the medical testimony, the court is not satisfied that the jury plainly erred in finding that the plaintiff's sickness and present diseased condition are the results of his exposure

to the conditions in the fire-room on the night of July 28, 1911. Nor do we think it can be held that the damages awarded are clearly excessive, for the evidence reasonably warrants the conclusion that the plaintiff is not only totally incapacitated for any manual labor now, and his health seriously and probably fatally impaired, but that there is no ground on which to base an expectation of any improvement in his condition.

THE EXCEPTIONS: It was not error for the presiding Justice to refuse to direct a verdict for the defendant. The court has already expressed its opinion that the evidence reasonably justified a finding in the plaintiff's favor. Accordingly the first exception is without merit.

The second exception was to the admission of the testimony of the plaintiff as to a conversation which he said he had with the second assistant engineer, McGowan, about half an hour before going down into the fire-room at the beginning of his watch, in which he claims to have said to McGowan that he "thought it was pretty tough for a man to go down into that water, and work in that water with the heat that was down there," and that the reply was "they couldn't make blood of one and bone of another." We find no reversible error in the admission of that testimony. The conversation tended to show notice to a superior officer of the ship of the then existing conditions in the fire-room and was competent evidence on the question of the defendant's negligence. It also tended to show a complaint or remonstrance by the plaintiff to his superior officer respecting the dangerous condition of the fire-room and for that purpose we think it was admissible. The only ground urged in argument against its admission is the claim on the part of the defendant that McGowan was not at the time of the conversation in charge of the engine room, but that his watch as an engineer terminated just before the conversation. The plaintiff however testified that at the time of the conversation McGowan was on duty and apparently was in charge of the engine room. The jury might have so found. It would not have been proper, therefore, for the trial court to have determined that question in advance and to have excluded the testimony. The defendant did not request the court to specially instruct the jury as to the effect of that testimony. This exception must accordingly be overruled.

An exception was taken to the admission against objection of a hypothetical question which the plaintiff's counsel asked of Dr.

Stuart. The question assumed among other things that the plaintiff at the time of his injuries "was a strong and vigorous man, in the enjoyment of good health." The objection was stated to be upon the ground that the question assumed "something which has not occurred in the case and which is absolutely disputed by the plaintiff's own evidence, that at that time he was or had always been a rugged man." The objection was based evidently on the claim that there had not been up to that time any sufficient evidence introduced from which the jury could find as a fact the assumption as to the plaintiff's health as stated in the question. Concerning the form and scope of the hypothetical question and the extent and limitations of its assumption of facts and circumstances much must be left to the discretion of the presiding Justice. In framing a hypothetical question the practice is for the question to contain the assumption of the existence of such facts and conditions as the jury may be authorized to find upon the evidence as it then is, or as there may be good reason to suppose it may thereafter appear to be. *Anderson* v. *Albertstamm,* 176 Mass., 87, 91. We have examined the testimony introduced in the case up to the time the question was asked and have compared it with the assumed fact of the question objected to and we think the question as framed was properly admitted. It plainly appears that it was the plaintiff's claim that he had been strong and healthy up to the night in question. He testified that he weighed 165 to 170 pounds when he shipped on the Fuller; that he worked at S. D. Warren's paper mills for about five years prior to that, and lost no time on account of sickness; and in cross examination he stated that since he had "the grippe" some fifteen years before he had never been sick a day. And Dr. Barrett had testified that he had known the plaintiff for five or six years, had treated him a few times for some minor troubles, and that his physical condition and general health was "good," and being asked if it so continued up to July, 1911, he replied "yes, I considered it so."

But it is pertinent here to call attention to the fact that later in the trial a very long hypothetical question, covering more than two printed pages of the record, and containing assumptions as to the plaintiff's good health and strong and physical condition at and prior to the time of his injuries, and fully covering all that was assumed in the question to which the exception was taken, was without objection asked of and answered by Dr. Addison S. Thayer, an

expert physician and surgeon called by the defendant. Because of that fact, if for no other reason, this exception should be overruled. *State* v. *Bennett,* 75 Maine, 590.

Winslow N. Eaton, a fireman on the Fuller, called by plaintiff, was asked in cross-examination if he thought he would be arrested for mutiny if he left the fire-room without permission, and answered "I didn't know anything about it." On re-direct examination his attention was called to that question and he was asked "Did you ever have any intimation from either of the engineers aboard that ship when they were in charge of the watch in regard to anything of that kind?" To that question the defendant's counsel objected on the ground that, "it should be limited to complaints as to the firemen." That objection we think was not infringed upon, for the witness then testified only as to what he claimed to have heard the first assistant engineer tell the fireman why they should not make complaints on the Portland end of the route. The defendant therefore can take nothing by this exception since the answer of the witness was strictly within the question as limited by the defendant's objection.

John J. McRae, who served as a fireman on the Fuller in 1908 and again in 1911, was permitted against objection to testify as to the condition of the holding-down bolts on the hopper in 1908, to the effect that they were then rusted and useless, and that in 1911 they were useless, and "there wasn't any." This testimony was competent and material. It tended to show the length of time the holding-down bolts had been suffered to be out of repair and not in usable condition, a fact which in itself is evidence of the defendant's negligence. *Johnson* v. *Boston Towboat Company,* 135 Mass., 209, 215. Further, it appears that during the trial, Moore, the chief engineer on the Fuller at the time in question, called by the defendant, was questioned in cross-examination without objection as to the condition of the holding-down bolts in 1907 when he came on the steamer; and as to the length of time those bolts had been gone altogether he said: "Well they have been gone four or five years or so." It is immaterial to consider the propriety of rulings first made when it appears that the same question has been substantially answered without objection before the close of the trial. *State* v. *Bennett,* supra.

Charles E. Brower, a marine engineer of 25 years' experience, called by the plaintiff was asked; "On other vessels what other contrivance is there adopted to prevent water coming into the ash ejector?" and against objection he was permitted to answer; "They have a valve on the outside of the pipe to keep the water from coming in." This testimony showing what other means or appliances were in use on other ships to prevent water from coming in through an ash ejector was admissible to aid the jury in determining whether the defendant had exercised reasonable care in maintaining the ash ejector in use on the Fuller. "It does not follow from the introduction of such evidence that the defendant was bound to use the very safest or newest, or any particular machinery or appliances; but, as 'reasonable care' is a relative term, the jury might properly consider what could be done to secure safety, and the evidence was competent." *Myers* v. *Hudson Iron Co.*, 150 Mass., 125, 137. See Labatt, Master and Servant, Sec. 43 (p. 109); *Haines* v. *Spencer*, 167 Fed., 266, 271.

And, again respecting this exception, before the trial was over Robert H. Fuller, an expert consulting engineer and marine surveyor, called by the defendant, in direct examination, testified definitely as to other types of ash ejector appliances, and particularly as to those having "a shuttle valve on the outside of the vessel which they could operate from a chain or other means to close that opening when they were not operating the hopper and prevent water from coming in."

Mr. Brower was also asked; "And when you are at sea if there is water on the floor, or the men are exposed to danger, are they permitted to leave their work?" and against objection he was permitted to answer : "Not if we can help it." As to this exception it need only be said that substantially the same question was fully answered by other witnesses without objection during the trial.

Finding no error in the rulings excepted to, it is the opinion of the court that the motion and exceptions should be overruled.

*Motion and exceptions overruled.*